104 Ill.2d 419 (1984)
472 N.E.2d 450
In re SPECIAL GRAND JURY INVESTIGATION OF ALLEGED VIOLATION OF THE JUVENILE COURT ACT (The People ex rel. John F. Donahue, Special State's Attorney, Appellee,
v.
Rob Warden, Appellant).
No. 60318.
Supreme Court of Illinois.
Opinion filed November 30, 1984.
*420 *421 Kelly R. Welsh and Ruth Miller, of Mayer, Brown & Platt, of Chicago, for appellant.
John F. Donahue, Special State's Attorney, of Oak Brook, pro se, and Stephen J. Culliton, Associate State's Attorney, of Blomingdale, for appellee.
Judgment reversed.
JUSTICE UNDERWOOD delivered the opinion of the court:
The question before us is whether the Du Page County circuit court properly divested a newspaper reporter of his statutory privilege to refuse to disclose his sources.
The proceedings stem from a Judicial Inquiry Board (the Board) investigation of Judge John Teschner of the circuit court of Du Page County, who was subsequently *422 charged with using inappropriate language during two juvenile court hearings in 1981. During its investigation, the Board had obtained transcripts of those hearings from the State's Attorney of Du Page County, Michael Fitzsimmons. Excerpts from Judge Teschner's statements were subsequently quoted in two Chicago newspapers, the Chicago Sun-Times and the Chicago Lawyer. The complaint against Judge Teschner was ultimately dismissed by the Illinois Courts Commission on August 3, 1983.
On December 9, 1983, the Du Page County Bar Association passed a resolution to petition the circuit court of Du Page County "to appoint a Special Prosecutor to investigate the disclosure of confidential information contained in the transcripts of the juvenile court proceedings * * *." Chief Judge Bruce Fawell thereafter appointed attorney John F. Donahue as a special State's Attorney "to investigate and to prosecute all potential criminal offenses where there is probable cause to believe that a person or persons has committed a violation of the Juvenile Court Act." Judge Fawell subsequently appointed attorney Stephen Culliton to assist in the investigation and ordered the impaneling of a special grand jury. Before that grand jury convened, the State's Attorney sought, and we denied, leave to file a petition for a writ of mandamus directing expungement of the orders appointing the special prosecutor and convening the special grand jury.
Judge Kevin P. Connelly, the first witness to appear before the grand jury, testified that he ordered the release of transcripts of the juvenile proceedings to either Patrick King or Vicki Rossetti, the assistant State's Attorneys who participated in the hearings before Judge Teschner. Judge Connelly stated that he routinely signed such orders since the State's Attorney's office is entitled under the Juvenile Court Act to transcripts of juvenile *423 court proceedings. Judge Connelly did not know how the transcripts were obtained by the news media.
Patrick King, the only member of the State's Attorney's staff to testify, stated that he received the transcripts and promptly delivered them to his supervisor, Thomas Knight, then chief of the criminal division of the State's Attorney's office. King denied giving the transcripts to the news media and testified that he had no knowledge of anyone in the State's Attorney's office releasing the information. He did acknowledge, however, that all members of the staff had access to the transcripts, and recalled seeing the transcripts in the possession of the first assistant, Mike Higgins. King further testified that a copy of a page from the transcripts was placed on a bulletin board in his office for two days.
James Warren, author of the Chicago Sun-Times article in which portions of Judge Teschner's statements were quoted, testified that the transcripts which he received were mailed to him in a brown envelope without a return address or cover letter, and that he did not know the identity of the person who sent them. However, the author of the article in the Chicago Lawyer, Rob Warden, testified that he knew who delivered transcripts to him, but invoked his privilege not to disclose that person's identity. It is unclear how many copies of the transcripts are in existence and whether those originally given the State's Attorney are the ones given the media.
Although three members of the Judicial Inquiry Board were subpoenaed, each invoked his constitutional privilege not to testify. See Ill. Const. 1970, art. VI, sec. 15.
The grand jury thereafter requested the special State's Attorney to file an application to divest Warden of his privilege to refuse disclosure. That application was granted by the Du Page County circuit court on May 23, 1984. Because of the importance of that decision we allowed *424 a direct appeal to this court pursuant to our Rule 302(b) (87 Ill.2d R. 302(b)). No question is raised regarding our jurisdiction.
Section 8-901 of the Code of Civil Procedure provides:
"No court may compel any person to disclose the source of any information obtained by a reporter during the course of his or her employment except as provided in Sections 8-901 through 8-909 of this Act." (Ill. Rev. Stat. 1981, ch. 110, par. 8-901.)
The reporter's privilege has evolved from a common law recognition that the compelled disclosure of a reporter's sources could compromise the news media's first amendment right to freely gather and disseminate information. (See Simon, Reporter Privilege: Can Nebraska Pass a Shield Law to Bind the Whole World?, 61 Neb. L. Rev. 446 (1982) (hereinafter Simon); Note, The Protection of Confidential News Sources: Enhancing the Utility of Ohio's Shield Law, 42 Ohio St. L.J. 1039 (1981); Guest & Stanzler, The Constitutional Argument for Newsmen Concealing Their Sources, 64 NW. U.L. Rev. 18 (1969).) In addition to Illinois, the privilege has been codified in some form in 25 States and adopted by judicial decision in eight others and the Federal courts. (See Simon; S. Metcalf, Rights and Liabilities of Publishers, Broadcasters and Reporters sec. 3.02 (1982) (hereinafter Metcalf).) These jurisdictions have generally followed the lead of the United States Supreme Court in the seminal case of Branzburg v. Hayes (1972), 408 U.S. 665, 33 L.Ed.2d 626, 92 S.Ct. 2646, permitting forced disclosure of the reporter's source when the public interest in the information is sufficiently compelling. (See Metcalf sec. 3.05; Note, The Protection of Confidential News Sources: Enhancing the Utility of Ohio's Shield Law, 42 Ohio St. L.J. 1039 (1981).) In Illinois, the privilege may be divested where "all other available sources of information *425 have been exhausted and disclosure of the information sought is essential to the protection of the public interest involved." (Ill. Rev. Stat. 1981, ch. 110, par. 8-907(2).) The circuit court concluded here that divestiture of Warden's privilege was justified since ascertaining the source of the information was essential to protect the confidentiality of juvenile court records, and "the chances of discovering the source through further investigation [was] remote at best." Warden challenges the correctness of those findings.
Like the circuit court, we have little difficulty concluding that a compelling public interest will be served by ascertaining the person or persons who violated the confidentiality provisions of the Juvenile Court Act. Our problem concerns the second requirement of section 8- 907  "that all other available sources of information have been exhausted." The parties' briefs dwell extensively on the question of what constitutes an "available source." Is it necessary, for instance, to question every person who could possibly have relevant information? Will it suffice to inquire only of those who are most likely to possess the information sought? There are other questions relating to the adequacy of the inquiries which are made. Must questioning be done or statements be made under oath? Will even sworn statements suffice if the maker is not available for questioning? Although no Illinois court has yet attempted to delineate the scope of section 8-907, every jurisdiction which has recognized a qualified reporter's privilege has also required a showing, prior to divestiture, that other sources of information have been exhausted. (See Metcalf sec. 3.07; Riley v. City of Chester (3d Cir.1979), 612 F.2d 708, 716.) The extent to which these alternatives must be pursued, however, is not entirely clear, and that question presents the courts with perhaps the most difficult problems in this area.
*426 The controlling standard has not been defined uniformly. Depending on the jurisdiction, it must be established that: "reasonable efforts" have been made to obtain the information elsewhere (Garland v. Torre (2d Cir.1958), 259 F.2d 545, 551; see also Connecticut State Board of Labor Relations v. Fagin (1976), 23 Conn. Supp. 204, 207, 370 A.2d 1095, 1097-98); proof by a preponderance of the evidence establishes the unavailability of less intrusive sources (State v. Boiardo (1980), 83 N.J. 350, 356, 416 A.2d 793, 796); the "only practical access to crucial information * * * is through the newsman's sources" (Riley v. City of Chester (3d Cir.1979), 612 F.2d 708, 717); "possible alternative sources" have not been exhausted (Zerilli v. Smith (D.C. Cir.1981), 656 F.2d 705, 714); "reasonably available alternative sources" have been exhausted (Clampitt v. Thurston County (1983), 98 Wash.2d 638, 644, 658 P.2d 641, 645; see also Winegard v. Oxberger (Iowa 1977), 258 N.W.2d 847, 852); "the party seeking the information has unsuccessfully attempted to obtain other sources less chilling of the First Amendment freedoms" (United States v. Blanton (S.D. Fla. 1982), 534 F. Supp. 295, 297); "the litigant has exhausted all other means of obtaining the information" (King v. Photo Marketing Association International (1983), 120 Mich. App. 527, 532, 327 N.W.2d 515, 518); the party has "attempted to obtain the information from other sources" (United States v. Criden (3d Cir.1980), 633 F.2d 346, 358); the material sought is not "available from a nonjournalistic source" (United States v. Cuthbertson (3d Cir.1980), 630 F.2d 139, 148); or that the information "is unavailable from any other source" (KDSO v. Superior Court (1982), 136 Cal. App.3d 374, 386, 186 Cal. Rpts. 211, 217-18).
Nor has the application of these varying standards been consistent. An extreme example involved two decisions of the Court of Appeals for the Second Circuit. In *427 Garland v. Torre (2d Cir.1958), 259 F.2d 545, the reporter's source was known to be an unidentified executive of the Columbia Broadcasting System. The court there held that the compelled disclosure was justified even though only three CBS executives were deposed. The court stated that "[w]hile it is possible that the plaintiff could have learned the identity of the informant by further discovery proceedings directed to [defendant], her reasonable efforts in that direction had met with singular lack of success." (Garland v. Torre (2d Cir.1958), 259 F.2d 545, 551.) However, in Baker v. F & F Investment (2d Cir.1972), 470 F.2d 778, the court concluded that disclosure of the reporter's source could not be compelled despite the fact that exhausting alternative sources might require that plaintiff depose as many as 60 others.
While the phrase "available source" is not easily defined, section 8-906 of the Code directs the court, in granting or denying divestiture, to consider "the adequacy of the remedy otherwise available, if any, the relevancy of the source, and the possibility of establishing by other means that which it is alleged the source requested will tend to prove" (Ill. Rev. Stat. 1981, ch. 110, par. 8-906). In our judgment, these provisions, when read with section 8-907, reflect a clear legislative intent to create a standard which balances the reporter's first amendment rights against the public interest in the information sought and the practical difficulties in obtaining the information elsewhere. Thus, the extent to which an investigation must be carried before the reporter's privilege should be divested cannot be reduced to any precise formula or definition but must, in view of the competing interests involved, depend on the facts and circumstances of the particular case. As Justice Powell noted in his concurring opinion in Branzburg: "The asserted claim to privilege should be judged on its facts by the striking of *428 a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct. The balance of these vital constitutional and societal interests on a case-by-case basis accords with the tried and traditional way of adjudicating such questions." (Branzburg v. Hayes (1972), 408 U.S. 665, 710, 33 L.Ed.2d 626, 656, 92 S.Ct. 2646, 2671 (Powell, J. concurring).) In our case, of course, the balance is to be struck between freedom of the press and the factors delineated in sections 8-906 and 8-907.
Under the circumstances here, we simply cannot agree with the circuit court that all other available sources of information have been exhausted as the statute requires. Assistant State's Attorney King indicated in his testimony that three other members of the State's Attorney's office had possession of the transcripts: assistant Vicki Rossetti, chief of the criminal division Thomas Knight, and first assistant Mike Higgins. In addition, it is undisputed that the State's Attorney had possession of the transcripts and released them to the Judicial Inquiry Board. The sworn testimony of these persons could easily have been obtained, and the possibility that they might have provided relevant information to the grand jury is apparent. Contrary to the suggestion of the special prosecutor, the special grand jury was not required to rely on hearsay statements or his representations regarding what other persons might have said had they appeared before that body. (Ill. Rev. Stat. 1981, ch. 38, par. 112-4.) In fact, the record shows that several grand jurors suggested questioning the persons earlier named but were repeatedly dissuaded by the special prosecutor on the basis that their testimony would be unnecessary if Warden's privilege could first be divested. The difficulty with that approach is that it is precisely the reverse of that intended by the General Assembly. We think it clear that the statute requires more than a showing of inconvenience *429 to the investigator before a reporter can be compelled to disclose his sources, and that at least those of the State's Attorney's staff who had possession of the transcripts should have appeared before the grand jury and testified as to their knowledge of the facts.
We therefore hold that the proof of exhaustion of alternative sources here was insufficient to justify divestiture of the reporter's privilege. In view of this holding it is unnecessary to consider whether others having access to the transcripts should also have been called to testify.
The judgment of the circuit court of Du Page County is accordingly reversed.
Judgment reversed.
JUSTICE CLARK took no part in the consideration or decision of this case.
JUSTICE SIMON, specially concurring:
I agree with the result reached in this case, and with the reasoning which leads to that result. I write specially because of my disagreement with one sentence in the opinion in this case  the sentence which reads: "* * * [W]e have little difficulty concluding that a compelling public interest will be served by ascertaining the person or persons who violated the confidentiality provisions of the Juvenile Court Act." 104 Ill.2d at 425.
The public interest which the Juvenile Court Act was designed to serve is the protection of the identity of the juveniles involved. That interest is not implicated here. Neither Mr. Warden nor anyone else released or threatened to release the names of any juveniles. What was exposed were the remarks of the judge who presided at the juvenile court hearing, not any information harmful to the juveniles. (In re Teschner (1983), 2 Ill. Cts. Com. 43.) Any reporter could have attended the juvenile proceedings and then reported what transpired without violating the Juvenile *430 Court Act. I cannot understand how the benevolent public purposes of the Act are served by ascertaining the identity of persons who may have exposed the comments of the trial judge uttered in open court when that exposure had nothing to do with the identity of a juvenile or the conduct in which a juvenile engaged and could in no way have harmed a juvenile. The Act was not intended, as I view it, to shield a judge rather than a juvenile.
Further, given the political context in which this investigation arose, I am concerned by this use of the public purpose behind the Juvenile Court Act. The events in question occurred in 1981 and were known at that time to have occurred; yet no investigation was requested until the spring of 1984, when the Du Page County State's Attorney was in the midst of a primary contest in which he was seeking reelection. The timing of the appointment of a special State's Attorney to investigate events which occurred so long past at least raises the suspicion that the move was designed to embarrass the State's Attorney in his reelection campaign. The call for a special prosecutor suggested that the incumbent State's Attorney at best was sleeping on the job or was himself the source of the exposure of the judge's remarks, and at worst was participating in a cover-up. This is especially worrisome since no protected interests of juveniles were violated, and there was no reason for Mr. Warden's reporter's privilege to be divested. We must not allow privileges, including those provided for by the Juvenile Court Act, to be used as tools in political campaigns.
I find no legitimate public interest which would be furthered under these circumstances by ascertaining the person or persons who disclosed the transcripts of the juvenile proceeding. My opinion is that the grand jury investigation served no useful purpose and should never have been instituted.