2023 IL App (1st) 221666

SIXTH DIVISION
October 27, 2023

No. 1-22-1666

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| NATHAN GIBBONS, | ) | |
| | ) | |
|     Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GLAXOSMITHKLINE, LLC; GLAXOSMITHKLINE, | ) | Appeal from the |
| PLC; BOEHRINGER INGELHEIM | ) | Circuit Court of |
| PHARMACEUTICALS, INC.; BOEHRINGER | ) | Cook County |
| INGELHEIM USA CORPORATION, INC.; SANOFI | ) | |
| US SERVICES INC; SANOFI-AVENTIS U.S. LLC; | ) | No. 2021 L 007406 |
| SAFEWAY, INC.; SAFEWAY HEALTH, INC.; | ) | |
| GROCERY OUTLET; and DOES 1 THROUGH 100 | ) | The Honorable |
| INCLUSIVE, | ) | Moira S. Johnson, |
| | ) | Judge Presiding. |
|     Defendants, | ) | |
| | ) | |
| (Journal of the American Medical Association, | ) | |
| | ) | |
|     Third-Party Respondent-Appellant). | ) | |
| | ) | |
| | ) | |

JUSTICE TAILOR delivered the judgment of the court, with opinion.
Presiding Justice Mikva and Justice Walker concurred in the judgment and opinion.

**OPINION**

¶ 1     Peer reviewed publications, like the Journal of the American Medical Association (JAMA),

publish manuscripts authored by experts only after they have been reviewed by experts in the same

field and determined to be scientifically sound and publication-worthy. A number of courts around the country have recognized the importance of maintaining the confidentiality of the identities of peer reviewers and their communications in order to promote complete and candid review and, thereby, enhance scientific, academic, and professional quality. However, no Illinois court has recognized a common law peer review privilege. Instead, publications like JAMA are considered reporters whose sources are generally protected from disclosure by the Illinois reporter's privilege statutes found in part 9 of article VIII of the Code of Civil Procedure (735 ILCS 5/8-901 to 8-909 (West 2022)). This qualified privilege may only be divested by the court in certain limited circumstances, which are not present here.

¶ 2                                   I. BACKGROUND

¶ 3      The plaintiff, Nathan Gibbons, brought a lawsuit against the defendants, GlaxoSmithKline, LLC (GSK), and other pharmaceutical companies, alleging that Zantac, the brand name for the drug ranitidine, caused his cancer. Zantac was first marketed and sold by GSK in 1983 and was commonly used to treat acid reflux, heartburn, and ulcers. Gibbons' lawsuit, which is currently pending in California, is part of a multi-plaintiff and multi-defendant action. Thousands of plaintiffs allege that Zantac caused them, or a deceased loved one, to develop cancer. They seek to hold GSK and other pharmaceutical companies who sold and marketed Zantac liable, contending that these companies knew or should have known of Zantac's cancer risks. Zantac was withdrawn from the market in April of 2020 at the Food and Drug Administration's (FDA) request.

¶ 4      In September 2019, Valisure—an analytical laboratory whose mission is to help ensure the safety, quality, and consistency of medications in the market—sent a citizen petition to the FDA, warning that it had "detected extremely high levels of N-Nitrosodimethylamine [a contaminant known by the acronym NDMA], a probable human carcinogen, in every lot [of Zantac] tested."

Valisure asked the FDA to "recall and suspend sales of all" ranitidine products "[g]iven the drug's propensity to form the probable carcinogen NDMA." It noted that "[i]nvestigators at Memorial Sloan Kettering Cancer Center are actively studying ranitidine to evaluate the extent of the public health implications of these findings."

¶ 5    That same month, Dr. Lior Braunstein, an oncologist and scientist at Memorial Sloan Kettering Cancer Center, submitted a manuscript that he and his colleagues had authored to JAMA for consideration. The mission of the American Medical Association, which publishes JAMA, is "to promote the science and art of medicine and the betterment of public health." JAMA's readers are mainly physicians, clinicians, scientists, and researchers, but JAMA articles are also read by policymakers, journalists, and the public.

¶ 6    Dr. Braunstein's manuscript, which he titled "Ranitidine Use, N-Nitrosodimethylamine (NDMA) Production, and Variations in Cancer Diagnoses," linked Zantac to different types of cancer. The manuscript noted "a possible association of ranitidine use with certain cancer presentations," and included a chart, depicting the "odds ratios of presenting cancer diagnoses in an oncology population among those receiving ranitidine vs. other [medications]." It stated that the data "may present a case for limiting ranitidine administration among patients who otherwise have feasible therapeutic alternatives."

¶ 7    JAMA subjected Dr. Braunstein's manuscript to peer review. Afterwards, JAMA informed Dr. Braunstein that while the manuscript was not yet suitable for publication, it could be published if edits were made. One peer reviewer commented that the manuscript was a "clinically significant and original research letter and should be published urgently given its potential impact on clinical practice." Another peer reviewer commented that the "[r]eported results raise potentially alarming findings, though further confirmatory research is warranted."

¶ 8      After Dr. Braunstein and his colleagues made JAMA's requested edits, JAMA accepted the manuscript and scheduled it for publication on January 10, 2020. On January 9, 2020, JAMA sent an embargoed copy of the article to the media and Sanofi, the company that owns and controls the Zantac brand. That same day, Dr. Braunstein received an e-mail from a news reporter, stating that Sanofi had disputed the article, claiming it "consist[ed] of analytical data which resulted from a testing methodology [the] FDA already has criticized as unsuitable for testing ranitidine and epidemiology results that do not establish that ranitidine increases the risk of cancer." Twenty-two minutes later, JAMA's editor-in-chief, Dr. Howard Bauchner, e-mailed Dr. Braunstein. He said that "a number of concerns ha[d] been raised about the validity of some of the results" in the article and that, "[b]ecause of the importance of the issue, and the public health implication of the reported findings," the article would no longer be published the next day, as scheduled. Dr. Braunstein later learned from JAMA's editorial group that "as [he had] anticipated, there were objections to the lab method from a few vocal/influential sources." Braunstein "presumed" it was the FDA that had objected to his "use of the now-outdated FDA testing protocol," but "d[id]n't recall [JAMA editors] explicitly saying so." He noted that the lab method he had employed was "the only protocol around when [his] work was done, and by the time [the article] reached publication, a new method became standard." JAMA told Dr. Braunstein that the article could still be accepted if the new testing method was utilized, so Braunstein conducted additional studies using the new testing method and then resubmitted his manuscript to JAMA.

¶ 9      On January 29, 2021, JAMA published a revised version of Dr. Braunstein's article in JAMA Network Open, which JAMA describes on its website as "an international, peer-reviewed, open access, general medical journal that publishes research on clinical care, innovation in health care, health policy, and global health across all health disciplines and countries for clinicians,

investigators, and policy makers." This version did not expressly link Zantac to cancer but noted that NDMA was "a probable human carcinogen" that was "recently detected in ranitidine products." The article concluded that "ranitidine may be a significant source of NDMA under a range of physiologically relevant conditions" and that the data "support[s] recent regulatory actions to limit ranitidine availability." The epidemiological data contained in the prior version of the article was omitted. A Valisure press release issued the same day noted that

"[Dr. Braunstein's] original, peer-reviewed manuscript also contained epidemiological data on the association between ranitidine and cancer. On January 9, 2020, the study was held prior to publication in light of requests that newly published chemical methods be employed and epidemiological data be further analyzed. In the following months, chemical analyses were rerun using the latest, FDA-recommended LC-MS methodology revealing the same ranitidine instability and this data is included in today's JAMA Network Open study. In the intervening months, initial epidemiologic analyses were also updated but will appear in a separate study."

Valisure's press release noted that because

"the authors of today's JAMA Network Open study believe that both the chemistry and epidemiology regarding the potential carcinogenic nature of ranitidine are of high importance for public health and should be a part of the scientific and medical domain, *** further chemical analysis was conducted by Valisure and added to the reanalyzed epidemiological data for a new study that is also being submitted to the pre-print server, MedRxiv."

Valisure noted that this study, which evaluated 10,347 cancer patients, found "a significant association between the use of ranitidine and elevated diagnosis rates of breast, thyroid, bladder, and prostate cancers."

¶ 10    On June 28, 2021, JAMA published another article concerning ranitidine. The article's lead author, Zongming Gao, Ph.D., is a research chemist employed by the FDA. The Gao article directly criticized the conclusion in Braunstein's article that NDMA "was formed when ranitidine and nitrite were added to simulated gastric fluid" and conversely asserted that "ranitidine is not converted to NDMA in gastric fluid at physiologic conditions."

¶ 11    Gibbons wanted to understand why JAMA had changed its mind at the eleventh hour and withheld publication of the original version of Dr. Braunstein's article. Gibbons initially suspected that GSK or other pharmaceutical companies had influenced JAMA's decision not to publish in an effort to suppress science that was critical of Zantac, but subsequent discovery revealed that the pharmaceutical companies had not contacted JAMA. Gibbons also deposed Dr. Braunstein and his co-authors in an effort to find out who convinced JAMA's editorial group to change its mind, but these depositions did not reveal JAMA's source.

¶ 12    During discovery in the California litigation, Gibbons filed a supplemental proceeding in the circuit court of Cook County in order to enforce a subpoena against JAMA because it was not a named party in the California lawsuit (JAMA is a publication of the American Medical Association, but we note that no issue is raised as to whether JAMA is a legal entity that is capable of being named a respondent in these proceedings). Gibbons sought communications concerning JAMA's decision not to publish Dr. Braunstein's original article on January 10, 2020. JAMA produced certain documents in response but refused to produce the bulk of the requested communications, arguing that they were protected by various privileges. Despite extensive "meet

and confer" efforts between the parties, JAMA did not produce any additional documents and continued to assert that all communications were protected by privilege. When Gibbons indicated that "a [privilege] log w[ould] be necessary for [him] to evaluate JAMA's privilege claims," JAMA refused to provide one. Gibbons then filed a petition for rule to show cause and an adjudication of indirect civil contempt, asking the circuit court to order JAMA to produce the requested documents.

¶ 13    On March 29, 2022, following a hearing on Gibbons' petition, the circuit court ordered JAMA to produce a privilege log for all withheld documents, to provide redacted versions of the documents to Gibbons, and to provide unredacted copies of the documents for the court to review *in camera*. It added that "[t]o the extent necessary to preserve JAMA's discovery objections and assertions of privilege, the documents furnished to [Gibbons] may redact information JAMA contends is privileged, and the privilege log may similarly limit the specificity of its entries."

¶ 14    JAMA's privilege log revealed for the first time that unidentified JAMA editors had exchanged over a dozen e-mails with "Government Official A" on January 9, 2020, the day before Dr. Braunstein's article was scheduled to be published. Between 7:08 a.m. and 1:36 p.m., "Government Official A" e-mailed back and forth with various JAMA editors. Dozens of internal e-mails about Braunstein's article were exchanged by various editors at JAMA as well, throughout the day. The subject line of the e-mails indicated "concerns about the ranitidine letter" JAMA had planned to publish the next day. JAMA did not identify "Government Official A" or offer any evidence that he or she served as a peer reviewer of the Braunstein article. The privilege log revealed that JAMA editors continued to exchange e-mails about the Braunstein article even after they decided not to publish it. JAMA's communications with "Government Official A" continued as well, until January 31, 2020.

¶ 15     On May 26, 2022, after conducting an *in camera* review of the documents submitted by JAMA, the court found that a common law peer review privilege did not apply to the documents at issue. However, it concluded that JAMA qualifies as a reporter, so any communications between JAMA and the anonymous government official were protected from disclosure by the Illinois reporter's privilege statutes.

¶ 16     On June 23, 2022, Gibbons filed a motion for divestiture of the Illinois reporter's privilege. Under the Illinois reporter's privilege statutes, the court may, under certain limited circumstances, divest a reporter of its privilege—that is, order the reporter to disclose sources of information otherwise protected. 735 ILCS 5/8-901 to 8-909 (West 2022); *People v. Pawlaczyk,* 189 Ill. 2d 177, 188 (2000). The court granted Gibbon's motion and ordered JAMA to disclose to Gibbons the communications it had with "Government Official A," as well as its internal communications concerning its decision to halt publication of the ranitidine article.

¶ 17     JAMA now appeals the court's order. It contends that it never should have been required to produce a privilege log in the first place, that it should not have to reveal any of the requested communications because they are covered by a common law peer review privilege and the Illinois reporter's privilege statutes, and that divestiture under the Illinois reporter's privilege statutes was improperly granted.

¶ 18     Before turning to the merits of this case, we address the question of jurisdiction. "Generally, an order allowing discovery or directing disclosure of information is considered interlocutory and, therefore, not appealable." *Laurent v. Brelji*, 74 Ill. App. 3d 214, 215 (1979). However, "[a]n order which in substance finally adjudicates the rights of the parties and terminates the litigation is final and appealable." *Id.* at 216. We have jurisdiction over this appeal because the court ruled on all of JAMA's asserted privileges, no other claims are pending between the parties,

and JAMA timely appealed the court's order. See *id.* (concluding that the trial court's discovery order was an appealable order because it "finally determined the rights of the parties before it and terminated the litigation" and distinguishing it from cases where discovery orders were entered in cases where the cause was still pending in the same court); *Pawlaczyk,* 189 Ill. 2d at 187 (the circuit court's divestiture orders are final and appealable orders); Ill. S. Ct. R. 301 (eff. Feb. 1, 1994); R. 303 (eff. July 1, 2017).

¶ 19                                    II. ANALYSIS

¶ 20                                    A. The Privilege Log

¶ 21     Gibbons' subpoena to JAMA sought "all documents reflecting communications about the [ranitidine] article *** that was set to be published on January 10, 2020" between JAMA and "any non-author," including "any government agency" as well as "documents and communications relating to the decision to stop publication of the [ranitidine] article." In response, JAMA asserted "privileges regarding confidential editorial peer review and any communications that might have occurred between editors, authors and peer reviewers regarding the Braunstein article originally set for publication on January 10, 2020." It stated that "decisions about whether to accept, revise, reject, delay or pull publication of submitted manuscripts are confidential and privileged, and must be excluded from production via third party discovery in order to preserve and advance scientific and medical research." It further stated that it would "not produce confidential documents and communications between the journal editors and authors, or reveal discussions among peer reviewers and editors regarding the submission, acceptance or rejection of manuscripts." JAMA asserted that these documents were part of its confidential peer-review process and informed the court that it did not provide a privilege log to Gibbons because it "would have identified the entity

that provided us the confidential peer-reviewed information, and that is precisely the information that is privileged from discovery." JAMA also asserted the attorney-client privilege.

¶ 22    The trial court ordered JAMA to produce a privilege log, with the accommodation that JAMA "could [leave] out whatever information it is that you're claiming can't be disclosed based on the privilege." The court said it would conduct an *in camera* review of the documents at issue before determining whether or not JAMA's claims of privilege would be sustained. JAMA argued that a privilege log was not required but said it could "provide the date that we received the information without disclosing who the information was from and we can say it concerned the methodology that was seen to be flawed in the article that had been scheduled for publication." JAMA informed the court that its privilege log would not "disclose who the information came from" or the "substance of the information."

¶ 23    JAMA argues on appeal that it was improper for the court to order it to produce a privilege log at all. We review the trial court's order for an abuse of discretion. See *Doe v. Township High School District 211,* 2015 IL App (1st) 140857, ¶ 81 ("discovery orders are generally subject to an abuse of discretion standard"). "[P]rivileges are strongly disfavored because they are in derogation of the search for truth." *In re Marriage of Daniels,* 240 Ill. App. 3d 314, 324 (1992). For this reason, "privileges must be strictly construed as an exception to the general duty to disclose." *Id.* at 325. "Ordinarily, [o]ne who claims to be exempt by reason of privilege from the general rule which compels all persons to disclose the truth has the burden of showing the facts which give rise to the privilege. His mere assertion that the matter is confidential and privileged will not suffice." (Internal quotation marks omitted.) *Thomas v. Page*, 361 Ill. App. 3d 484, 497 (2005). Illinois Supreme Court Rule 201(n) (eff. Mar. 17, 2023) states that

"[w]hen information or documents are withheld from disclosure or discovery on a claim that they are privileged pursuant to a common law or statutory privilege, any such claim shall be made expressly and shall be supported by a description of the nature of the documents, communications or things not produced or disclosed and the exact privilege which is being claimed."

"A privilege log is a discovery tool that may be used to establish a claim of privilege over certain documents or information pursuant to Illinois Supreme Court Rule 201(n) (eff. July 1, 2014)." *Findlay v. Chicago Title Insurance Co.*, 2022 IL App (1st) 210889, ¶ 112 n.5; see also *FMC Corp. v. Trimac Bulk Transportation Services, Inc.*, No. 98 C 5894, 2000 WL 1745179, at *1 (N.D. Ill. Nov. 27, 2000) (stating that "the log should contain an explanation of why the document is privileged that is sufficiently detailed to allow the court to determine whether the discovery opponent has discharged its burden of establishing the requirements of the privilege"). "The purpose of [Rule 201(n)] is to enable the court to evaluate the applicability of the asserted privilege and determine the need for an *in camera* inspection of the documents, and also to minimize any disputes between the parties regarding those matters." *Thomas*, 361 Ill. App. 3d at 497. "Typically, a privilege log must identify each document and provide basic information, including the author, recipient, date and general nature of the document." *Securities & Exchange Comm'n v. Thrasher*, No. 92 CIV. 6987, 1996 WL 125661, at *1 (S.D.N.Y. Mar. 20, 1996). However, "if detailed disclosure would, in effect, reveal the very information that may be privileged, the party may tailor his response to mask such sensitive information." *Id.*

¶ 24    In *Selby v. O'Dea*, 2017 IL App (1st) 151572, ¶¶ 2, 107, the trial court found that a privilege log under Rule 201(n) and an *in camera* review of the disputed documents were unnecessary after determining that the attorney-client privilege was not waived when codefendants met and shared

information about a lawsuit pursuant to their " 'joint defense agreement.' " Our court vacated the judgment in part and remanded, however, because the trial court failed to determine which communications were protected by the privilege. *Id.* ¶ 110. The court stated that it "d[id] not know *** what was said in the joint conferences" and pointed out that only statements that furthered the codefendants' common interest in defeating plaintiff's lawsuit would be covered by the common-interest exception to the waiver rule. *Id.* ¶ 109. After noting that "the burden of establishing the privileged nature of the communication will fall on the party asserting the privilege" and that federal courts "typically conduct a communication-by-communication analysis to ensure that only protected communications are withheld from disclosure," it remanded so the trial court could "conduct an *in camera*, communication-by-communication analysis" and perform "whatever analysis necessary to determine whether each communication falls within the common-interest exception to the waiver rule." *Id.* ¶¶ 110-12. The court concluded that only through a privilege log and *in camera* review of the disputed documents could it be determined which statements were protected under the common-interest exception to the waiver rule. *Id.* ¶¶ 109-10.

¶ 25    JAMA claims that a privilege log was not required here because its "overall description [of the documents at issue] g[ave] the Court everything it need[ed] to know about why the documents are confidential." We disagree. JAMA's broad assertion that any communications related to the ranitidine article were protected under the Illinois reporter's privilege statutes and by a common law peer review privilege was insufficient to meet its burden under Rule 201(n). See *Thomas*, 361 Ill. App. 3d at 497 (a "mere assertion that the matter is confidential and privileged will not suffice" (internal quotation marks omitted)). Before being ordered to produce a privilege log by the court, JAMA provided only minimal information to Gibbons to support its claims of privilege. It did not indicate the number of communications it had received, the specific privileges it was asserting as

to each communication, or the nature of each communication. Even in instances where we have found a privilege log unnecessary, the proponent of the privilege provided the kind of information that a privilege log would typically contain. See *id.* at 498 (finding that as long as the non-party Justices invoking the judicial deliberation privilege "disclose[d] the persons who authored, sent or received the withheld documents and [were] able to describe the nature of the documents by category sufficient to enable the trial court to determine whether the documents f[e]ll within the scope of the claimed privilege," a privilege log would not be required).

¶ 26    And although JAMA argued that producing a privilege log would force them to "identify the entity that provided us the confidential peer-reviewed information," the court permitted JAMA to "[leave] out whatever information it is that [it was] claiming can't be disclosed based on the privilege." That is exactly what JAMA did here. JAMA's privilege log did not identify the editors involved, referred to the government official who e-mailed JAMA only as "Government Official A," did not disclose the contents of the e-mail exchanges between JAMA editors and the anonymous government official or the substance of the communications between JAMA's editorial staff, and included only the subject line for the e-mails exchanged. Moreover, because JAMA asserted three different privileges—a common law peer review privilege, a privilege under the Illinois reporter's privilege statutes, and an attorney-client privilege—a privilege log was necessary so the court could determine whether the requested communications fell within the scope of any of JAMA's asserted privileges. For this reason, we find that the trial court properly exercised its discretion when it ordered JAMA to produce a privilege log here.

¶ 27                 B. The Common Law Peer Review Privilege

¶ 28    At the May 26, 2022, hearing, the parties presented arguments about the applicability of a common law peer review privilege to the communications between JAMA editors and the

anonymous government official, as well as the internal communications among JAMA's editors that took place on or after January 9, 2020, in relation to the government official's concerns about Dr. Braunstein's original article. Gibbons argued that a peer review privilege does not apply to any of the requested communications because "we're not dealing with a peer review situation here. We already have the actual peer review comments. We have the identities of the peer reviewers themselves *** The peer review process had concluded" at the time these e-mails were sent. JAMA argued in response that "the need for peer review and editorial evaluation does not necessarily end when a manuscript is accepted, scheduled for publication or even published" because "[m]edical journals are responsible for the scientific integrity of material they publish long after an article is published and circulated." Thus, "editors may engage in peer review and editorial evaluation years after publication of an article if, for example, a question arises about the validity or accuracy of a study." After reviewing the privilege log and the documents provided by JAMA *in camera*, the court rejected JAMA's peer review privilege claim.

¶ 29    JAMA argues on appeal that the trial court incorrectly concluded that a common law peer review privilege did not apply to the documents at issue because the peer review process is dynamic and ongoing, even after a decision has been made to publish an article. Gibbons argues in response that because (1) the peer review process had already concluded when the e-mails at issue were sent, (2) embargoed copies of the article had already been circulated, and (3) the article was scheduled for publication the next day, the court correctly found that the dozens of e-mails between JAMA editors and the government official and those sent back and forth between JAMA editors concerning the ranitidine article were not protected by a peer review privilege. Like the circuit court, we reviewed these communications *in camera* in order to address JAMA's claim.

¶ 30    The question of whether a common law peer review privilege exists is a question of law, which we review *de novo*. *Cf. Nielson v. SwedishAmerican Hospital*, 2017 IL App (2d) 160743, ¶ 28 (question of the application of the peer review privilege relating to a health care practitioner's professional competence under the medical studies privilege (735 ILCS 5/8-2101, 8-2102 (West 2014)) is reviewed *de novo*).

¶ 31    While Gibbons does not dispute the existence of a common law peer review privilege in Illinois, we are unaware of any reviewing court decision that recognizes a common law peer review privilege in the context of the review of manuscripts submitted to professional journals. JAMA relies on a number of cases that acknowledge the importance of the confidentiality of the peer review process, but none of these cases recognize a common law peer review privilege. See, *e.g.*, *In re Bextra & Celebrex Marketing Sales Practices & Products Liability Litigation*, 249 F.R.D. 8, 10-13, 12 n.3 (D. Mass. 2008) (when a manufacturer of arthritis drugs moved to compel a medical journal to disclose its communications with the authors of articles about its arthritis drugs and the journal asserted that the materials were protected by certain privileges, the court concluded that the peer review privilege was "not directly applicable" and instead employed the balancing test in Federal Rule of Civil Procedure 26(b)(1) to decide whether the journal should be compelled to turn over the requested information); *In re Bextra & Celebrex Marketing Sales Practices & Product Liability Litigation*, No. 08 C 402, 2008 WL 4345158, at *2-3 (N.D. Ill. Mar. 14, 2008) (when a pharmaceutical manufacturer issued subpoenas to several medical journals seeking documents regarding the peer review process and the journals refused to produce anything in response based on various privileges, the court found that the privileges asserted "would not seem to apply" and instead employed the balancing test in Federal Rule of Civil Procedure 26(b)(1) to determine whether the documents should be protected from disclosure); *Cukier v. American*

*Medical Ass'n*, 259 Ill. App. 3d 159, 160-61 (1994) (when the petitioner sought documents from JAMA in an attempt to identify the individuals or entities responsible for making allegedly defamatory statements to JAMA about him, and JAMA refused to produce the requested documents because it claimed they were privileged under the Illinois reporter's privilege statutes and the medical studies privilege, the trial court indicated that it "would not rule on the applicability of the Medical Studies Act" because it "did not have guidance"; instead, it found that the reporter's privilege statutes applied).

¶ 32    While we recognize that the medical studies privilege (735 ILCS 5/8-2101 (West 2022)) establishes a statutory peer review privilege relating to health care practitioners' professional competence (see, *e.g.*, *Ardisana v. Northwest Community Hospital, Inc.*, 342 Ill. App. 3d 741, 746-47 (2003)), we find no grounds to extend that privilege here. Our supreme court has instructed that "the extension of an existing privilege or establishment of a new one is a matter best deferred to the legislature." See *People ex rel. Birkett v. City of Chicago*, 184 Ill. 2d 521, 528 (1998); see also *People v. Sanders*, 99 Ill. 2d 262, 269 (1983) (noting that the vast majority of all privileges in Illinois are statutory ones). In the absence of any statutory privilege, we hold that there is no common law peer privilege applicable to professional publications like JAMA. Therefore, we agree with the trial court's ultimate conclusion that the communications at issue here were not protected under the common law.

¶ 33                    C. Divestiture Under the Illinois Reporter's Privilege Statutes

¶ 34    JAMA next argues that the subject communications are protected under the Illinois reporter's privilege statutes and that the court improperly granted divestiture here. The Illinois reporter's privilege statutes state that "[n]o court may compel any person to disclose the source of any information obtained by a reporter except as provided in Part 9 of Article VIII of this Act."

16

735 ILCS 5/8-901 (West 2022). The statute defines a "reporter" as "any person regularly engaged in the business of collecting, writing or editing news for publication through a news medium on a full-time or part-time basis." *Id.* § 8-902(a). A "news medium" includes "any newspaper or other periodical issued at regular intervals *** and having a general circulation." *Id.* § 8-902(b). In *Cukier* , 259 Ill. App. 3d at 164, this court found that JAMA met the definition of a "reporter" under the reporter's privilege statutes, and Gibbons does not dispute this. Therefore, the only issue on appeal is whether the trial court properly granted divestiture.

¶ 35    The parties dispute the applicable standard of review. Gibbons contends that the manifest weight of the evidence standard applies, whereas JAMA urges us to review this issue *de novo*. For support, JAMA points to *People v. McKee*, 2014 IL App (3d) 130696, ¶ 10, where the court applied a *de novo* standard of review when determining whether the trial court properly granted divestiture. In *McKee*, however, the "dispositive question on appeal concern[ed] the scope of relevancy." *Id.* The reporter "argue[d] for a narrow definition of relevance, while the defendant argue[d] for a broad definition of relevance." *Id.* Because the appeal concerned a question of law, the court applied *de novo* review. *Id.* Here, by contrast, the parties agree on the applicable law and merely dispute the trial court's application of the law to the facts in this case. Although the trial court did not hear evidence, it did undertake an *in camera* review of the documents at issue, which we presume was the basis of its factual determination that Gibbons satisfied the statutory requirements to divest JAMA of its reporter's privilege. For this reason, we conclude that the manifest weight of the evidence standard applies. See *Pawlaczyk*, 189 Ill. 2d at 188 (when determining whether the trial court properly granted divestiture, we review the court's factual findings and "will disturb the lower court's findings under the statute only if they are against the manifest weight of the evidence"); *In re Subpoena Duces Tecum to Arya*, 226 Ill. App. 3d 848, 854 (1992) (concluding

that, in divestiture proceedings, "the trial court's factual findings on appeal [cannot be reversed] unless they are against the manifest weight of the evidence").

¶ 36    The reporter's privilege, as its name implies, belongs to the reporter (*Simon v. Northwestern University*, No. 1:15-cv-1433, 2017 WL 1197097, at *4 (N.D. Ill. Mar. 31, 2017)), but this privilege is qualified, not absolute. *Pawlaczyk*, 189 Ill. 2d at 187. A party may apply to divest the privilege by moving the court to order the reporter to disclose his or her source of information. See 735 ILCS 5/8-903 (West 2022). The divestiture application must allege "[t]he name of the reporter and of the news medium ***; the specific information sought and its relevancy to the proceedings" and "a specific public interest which would be adversely affected if the factual information sought were not disclosed." *Id.* § 8-904.

¶ 37    When deciding whether to grant or deny divestiture of the privilege, the court should consider "the nature of the proceedings, the merits of the claim or defense, the adequacy of the remedy otherwise available, if any, the relevancy of the source, and the possibility of establishing by other means that which it is alleged the source requested will tend to prove." *Id.* § 8-906. The court should order divestiture only if it finds that the information sought is not required to be kept secret under state or federal laws, "that all other available sources of information have been exhausted," and that "disclosure of the information sought is essential to the protection of the public interest involved." *Id.* § 8-907(1), (2). The party seeking divestiture bears the burden of establishing each and every one of these elements (*Pawlaczyk*, 189 Ill. 2d at 188), and divestiture should be "the last resort to get the sought-after information." *Arya*, 226 Ill. App. 3d at 862.

¶ 38    JAMA argues that Gibbons failed to satisfy his burden to establish three of the divestiture requirements: (1) that the privileged information is relevant to the proceedings, (2) that all other sources of the information have been exhausted, and (3) that a specific public interest makes

disclosure essential. If Gibbons fails to satisfy any one of these requirements, then his divestiture application must fail.

¶ 39    First, we address the trial court's finding that the privileged information is relevant to the proceedings. In its decision, the court noted that Gibbons's claims in the California litigation regarding Zantac were based on theories of strict liability and negligence and that, under California law, strict liability requires the plaintiff to show "a defect in the manufacture or design of the product or failure to warn, causation, and injury" and negligence requires plaintiff to prove a duty, breach, causation, and damage. The court commented that "disclosing the identity of JAMA's government agency source is relevant" if it helps Gibbons prove any of his asserted claims, and that the privileged information at issue here was relevant because

> "[JAMA] strongly suggests that research published in JAMA after [Dr. Braunstein's] original article was pulled should be regarded as superior *** [JAMA] seems to say that, as compared with [Dr. Braunstein's] rejected article, later works constitute a corrected ('updated') body of research. But without the ability to discover the source of the government communications which apparently prompted JAMA to reject [Dr. Braunstein's] first article immediately before its scheduled publication, [Gibbons] would likely be deprived of a fertile area for challenging [GSK's] position. With guidance from *Pawlaczyk* that material is sufficiently relevant under the Act if it is 'relevant to a fact of consequence,' and that 'critical relevancy' is unnecessary, the Court finds that the material sought is relevant to the California proceedings."

¶ 40    At oral argument, Gibbons confirmed that he believes the privileged communications at issue are relevant to the causation element of his claims in the California lawsuit. A fact is relevant "if it tends to make the existence of any fact that is of consequence to the determination of the

19

action more probable or less probable than it would be without the evidence." *Pawlaczyk*, 189 Ill. 2d at 193; Ill. R. Evid. 401 (eff. Jan. 1, 2011). Although " 'critical' relevancy' " is not required (*Pawlaczyk,* 189 Ill. 2d at 195), "relevance to *** collateral matters is not sufficient to satisfy section 8-904's threshold requirement that the sought-after information be relevant to the proceedings in which it is being sought." *McKee*, 2014 IL App (3d) 130696, ¶ 14.

¶ 41    In *McKee*, the State charged the defendant and three others with the murders of two men. *Id.* ¶ 1. After the indictment was filed, a reporter wrote several articles that contained alleged details about the murders. *Id.* Defendant's counsel filed a motion to divest the reporter of his privilege, seeking the reporter's source, which the trial court granted. *Id.* Although the trial court noted that the information being sought was "seemingly off topic with regard to the murder charges," it granted divestiture because the source of the information was an attorney or a staff member of an attorney and, therefore, the information being sought pertained to whether the "leak" violated Illinois Supreme Court rules or other Illinois law. *Id.* ¶ 14. On appeal, the court reversed. *Id.* It concluded that because the information sought related to "collateral matters"—namely, whether the "leak" violated Illinois laws and rules—it was not relevant to a fact of consequence to the first degree murder allegations. Therefore, it was insufficient to satisfy the requirements for divestiture. *Id.*

¶ 42    In Gibbons' lawsuit against GSK and other pharmaceutical companies, he alleges that Zantac caused him to develop cancer. For the information to be relevant to the California proceedings, it would need to make the causation element of his strict liability and negligence claims more or less probable. Although our ability to explain our decision more fully is constrained by the privilege issues at stake, we find, based on our own *in camera* review, that the e-mails between JAMA and its government source and JAMA's ensuing internal communications

concerning its decision to withhold publication of Dr. Braunstein's article are not relevant to Gibbons's underlying lawsuit against the pharmaceutical company defendants. Gibbons already knows (based on Dr. Braunstein's communications with JAMA) that JAMA withheld publication of Dr. Braunstein's article due to "a number of concerns [that] ha[d] been raised about the validity of some of the results" based on the testing methodology he used. Dr. Braunstein admitted that he "anticipated" these objections (which he "presumed" came from the FDA) due to his "use of the now-outdated FDA testing protocol." Regardless of whether these "concerns" about Dr. Braunstein's use of an outdated testing protocol came from the FDA or from another governmental agency, we fail to see their relevance to Gibbons's causation argument in the California litigation.

¶ 43    Gibbons argues that the identity of "Government Official A" and his or her communications with JAMA are relevant to his underlying case because if the FDA or another government agency was involved in "suppressing" Dr. Braunstein's original article, this "government misfeasance, particularly FDA misfeasance *** directly bears on the weight of the science that shapes the parties' causation arguments." However, the FDA and other governmental agencies are not named as defendants in Gibbons's lawsuit, and his complaint does not allege any government misfeasance. Thus, any alleged government misfeasance is a "collateral matter" that is not directly relevant to Gibbons' claims that the pharmaceutical company defendants intentionally or negligently marketed a drug that caused cancer. Moreover, we note that any insinuation that the FDA intervened to stop publication of Dr. Braunstein's article in JAMA—not because of concerns about his use of an outdated testing methodology but to suppress the science supporting his causation theory—is belied by the FDA's decision to request the withdrawal of ranitidine from the market in April 2020, due to its concerns about "consumer exposure to unacceptable levels of [NDMA]" and the FDA's acknowledgement that NDMA is a probable

21

human carcinogen. It also bears observing that the Gao study is publicly available, so Gibbons knows the basis for Dr. Gao's criticism of the findings in Dr. Braunstein's study. We do not see how what JAMA editors or government regulators thought about the Braunstein and Gao studies is relevant to the causation issue in the California litigation. We find that, just as the source of the leak was collateral to the murder charges in *McKee* (*id.*), so too any government misfeasance regarding the regulation of Zantac is collateral to the causation question in Gibbons' underlying lawsuit.

¶ 44    Nor do see how JAMA's internal communications about its decision to withhold publication of Dr. Braunstein's original article are relevant to Gibbons' causation argument in the California litigation. Whatever JAMA editors discussed among themselves about "Government Official A's" concerns, including any reactions they had or opinions they may have formed, simply do not bear on the causation issue in the underlying action. Likewise, whatever JAMA editors may have discussed among themselves about Dr. Braunstein's article and their decision to withhold its publication are collateral to the causation issue in the underlying litigation. In addition, although the Illinois reporter's privilege statutes protect the identity of sources (735 ILCS 5/8-901 (West 2022); *Pawlaczyk,* 189 Ill. 2d at 187), we find that the entirety of JAMA's internal communications is nonetheless protected because the identity of JAMA's source is so deeply embedded in the subject communications that disclosing them even with the official's name redacted would likely still reveal JAMA's government source. For the reasons above, we find that the trial court's conclusion—that the privileged information was relevant to Gibbons's lawsuit—was against the manifest weight of the evidence.

¶ 45 We also find that the trial court's conclusion that Gibbons had sufficiently exhausted other sources of information was against the manifest weight of the evidence. In its decision, the trial court found that Gibbons had satisfied the exhaustion requirement, explaining that Gibbons

> "averred that multiple depositions of researchers have been taken, along with review of thousands of documents from researchers. The documents included, *inter alia*, certain JAMA communications concerning the article that was pulled just before publication. These discovery materials did not disclose JAMA's government agency source of information leading to the publication approval being rescinded. Also relevant to this factor is the Freedom of Information Act argument presented by [JAMA], asserting that the source can be revealed through diligent use of the FOIA process. Respondents contend the FOIA requires responses for requests within 20 working days pursuant to 5 U.S.C. § [552](a)(6)(A). On the other hand, [Gibbons] asserts through an affidavit that it will take at least two years just to process their request with one agency (the FDA), and another year after that to produce the documents. Moreover, [Gibbons] contends that the identity of the exact agency is still unknown and that he should not be required to file a FOIA request with every agency that might be involved.
>
> The Court finds that it is unnecessary to require [Gibbons] to FOIA request every government agency that it suspects could have been involved in the process. Exhaustion is established when there has been a thorough and comprehensive process. *** The Court finds that there has been such a process."

The court also noted that "the source government agency remains anonymous" and that "to require [Gibbons] to undergo a fishing expedition is wholly unnecessary."

¶ 46    To meet the exhaustion requirement, the petitioner must show that he has exhausted "all other available sources of information." 735 ILCS 5/8-907(2) (West 2022). These "sources" are "specific persons or things that can themselves provide the sought-after testimony or evidence," including those that are "identified or known, or those sources that are *likely* to become identified or known as a result of a thorough and comprehensive investigation." (Emphasis in original.) *Arya*, 226 Ill. App. 3d at 860. "[T]he statute requires more than a showing of inconvenience to the investigator before a reporter can be compelled to disclose his sources." *In re Special Grand Jury Investigation of Alleged Violation of the Juvenile Court Act*, 104 Ill. 2d 419, 428-29 (1984). A petitioner "must satisfy the court that its investigation has been sufficiently thorough and comprehensive that further efforts to obtain the sought-after information would not likely be successful." *Arya*, 226 Ill. App. 3d at 861. "[T]he extent to which an investigation must be carried before the reporter's privilege should be divested cannot be reduced to any precise formula or definition but must, in view of the competing interests involved, depend on the facts and circumstances of the particular case." *In re Special Grand Jury*, 104 Ill. 2d at 427.

¶ 47    In *In re Special Grand Jury*, a judge was charged with using inappropriate language during confidential juvenile court hearings. *Id.* at 421-22; see also 705 ILCS 405/1-8 (West 2022) (addressing the confidentiality and accessibility of juvenile court records). During a Judicial Inquiry Board investigation into the matter, the board obtained transcripts of the hearings. *In re Special Grand Jury*, 104 Ill. 2d at 422. Excerpts of the judge's statements were then quoted in several newspapers. *Id.* Afterwards, a special prosecutor was appointed to investigate disclosure of the confidential transcripts, and a grand jury was convened to hear testimony on the matter. *Id.* Witnesses acknowledged that all members of the state's attorney's office had access to the transcripts, and testimony established that three specific individuals had been given possession. *Id.*

at 423. A newspaper reporter admitted that he knew who delivered the transcripts to him, but he invoked his privilege not to disclose his source. *Id.* The State filed an application to divest the reporter of his privilege, and the trial court granted it, concluding that " 'the chances of discovering the source through further investigation [was] remote at best.' " *Id.* at 425. On appeal, the court said it "c[ould not] agree" that "all other available sources of information have been exhausted as the statute requires" when testimony revealed that three individuals had possession of the transcripts and it was "undisputed" that the state's attorney's office was in possession of them. *Id.* at 428-29. The court therefore concluded that divestiture was not warranted. *Id.*

¶ 48    In *Arya*, a reporter possessed notes and videotapes pertaining to a triple murder and armed robbery. 226 Ill. App. 3d at 849. The reporter gave the police information about an uncharged suspect based on information he received, but he refused to disclose his sources. *Id.* at 849-50. Because the State believed these sources would have significant information related to their investigation, it moved to divest the reporter of his privilege. *Id.* The trial court granted the motion, concluding that divesture was proper because the police had conducted a thorough and comprehensive investigation and had only been able to learn that some of the individuals "might live in Springfield and none of them will talk to the police." *Id.* at 861. After the reporter appealed, the court vacated the divestiture order and remanded due to concerns about the sufficiency of the record to support the trial court's finding that the State exhausted all available sources. *Id.* It reasoned that "a petitioner must satisfy the court that its investigation has been sufficiently thorough and comprehensive that further efforts to obtain the sought-after information would not likely be successful. It is *not* sufficient investigation for the State to merely assert that its investigation has not revealed the information sought." (Emphasis in original.) *Id.*

¶ 49    Here, we conclude that the trial court's finding—that Gibbons had sufficiently exhausted all available sources of information—was against the manifest weight of the evidence. Gibbons admitted that he "suspect[ed] that it was likely the FDA that intervened" to halt publication of Dr. Braunstein's article, yet he never submitted a Freedom of Information Act (FOIA) (5 U.S.C. § 552 (2018)) request to the FDA before seeking to divest JAMA of its reporter's privilege. Although Gibbons asserts that "the FDA would not even know where to begin" with his request, he was seeking a limited number of e-mails between "Government Official A" and JAMA, and he even knew the dates the e-mails were sent, the times the e-mails were sent, and the subject lines for the e-mails. This amount of specificity would provide the FDA with the information necessary to respond to his request. Gibbons also asserts that because he does not even know what government agency was involved, sending FOIA requests to "an unending set of government agencies and employees is absurd, and is not what the law requires." We agree that Gibbons would not need to submit endless FOIA requests to numerous government agencies to satisfy the exhaustion requirement here. However, Gibbons knew that Dr. Braunstein "presumed" it was the FDA that had objected to his "use of the now-outdated FDA testing protocol." Moreover, Gibbons concedes it was "likely the FDA that intervened" because it is the agency responsible for regulating pharmaceutical drugs.

¶ 50    Gibbons nevertheless claims filing a FOIA request would be futile because he was told it would take "at least two years" to process a different FOIA request he made to the FDA and "another year" to produce the documents. JAMA counters Gibbons's timeline by noting that FOIA requires responses to requests within 20 working days pursuant to the FOIA statute (see *id.* § 552(a)(6)(A)(i)(I) (the agency "shall *** determine within 20 days *** after the receipt of any such request whether to comply with such request and shall immediately notify the person making

such request of *** such determination and the reasons therefor")). If Gibbons had sent an FOIA request to the FDA for the information he seeks and had been informed that the request would take years to produce (a position that we suspect would be viewed skeptically by any court given the detailed specificity of what Gibbons sought), we may have reached a different result. However, we note that "the legislature intended divestiture of a reporter's privilege to be the last resort to get the sought-after information." *Arya*, 226 Ill. App. 3d at 862. Because Gibbons suspected it was the FDA that contacted JAMA with concerns about Dr. Braunstein's article and because the FDA is the federal regulator of pharmaceutical drugs, we find he was required, under the statute, to attempt to obtain the information from that agency before seeking divestiture here. See *id.* at 861 ("[P]etitioner must satisfy the court that its investigation has been sufficiently thorough and comprehensive that further efforts to obtain the sought-after information would not likely be successful. It is not sufficient investigation for [petitioner] to merely assert that its investigation has not revealed the information sought." (Emphasis omitted.))

¶ 51     For the reasons above, we find that the trial court's conclusions—that Gibbons satisfied the relevance and exhaustion requirements—were against the manifest weight of the evidence and that its decision to grant divestiture under the Illinois reporter's privilege statutes was improper. See *Pawlaczyk*, 189 Ill. 2d at 188; *McKee*, 2014 IL App (3d) 130696, ¶ 14. We therefore reverse the order to divest JAMA of its statutory privilege.

¶ 52                                III. CONCLUSION

¶ 53     For the foregoing reasons, the judgment of the circuit court is affirmed in part and reversed in part. We affirm the trial court's decision to order JAMA to produce a privilege log and its finding that the subject documents are not protected under a common law peer review privilege (because

no such privilege exists). However, we reverse the trial court's decision to grant Gibbons's motion for divestiture under the Illinois reporter's privilege statutes.

¶ 54    Affirmed in part and reversed in part.

*Gibbons v. GlaxoSmithKline, LLC*, 2023 IL App (1st) 221666

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 2021-L-007406; the Hon. Moira S. Johnson, Judge, presiding. |
| **Attorneys for Appellant:** | Jack R. Bierig, Jonathan Judge, Catherine M. Masters, and Max Heckendorn, of Arentfox Schiff LLP, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Matthew S. Sims and Zartosht T. Khodavandi, of Rapoport Weisberg & Sims, P.C., of Chicago, and R. Brent Wisner, Adam M. Foster, and Harrison E. James, of Wisner Baum, LLP, of Los Angeles, California, for appellee. |